592 P.2d 1274
**The STATE of Arizona, Appellee,**

v.

**Henry SUELLS, Appellant.**

**No. 2 CA–CR 1425.**

Court of Appeals of Arizona,
Division 2.

Nov. 27, 1978.

Supplemental Opinion Jan. 17, 1979.

Rehearing Denied Feb. 28, 1979.

Review Denied March 20, 1979.

---

John A. LaSota, Jr., Atty. Gen. by Philip G. Urry, Asst. Atty. Gen., Tucson, for appellee; Stephen D. Neely, Pima County Atty., by D. Jesse Smith, Deputy County Atty., on rehearing.

John M. Neis, Pima County Public Defender by James E. Sherman, Asst. Public Defender, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant was convicted by a jury of first-degree rape and robbery with a prior conviction. He was sentenced to concurrent prison terms of not less than 15 nor more than 21 years for the rape and not less than 12 nor more than 15 years on the robbery conviction. He contends that the trial court erred in not suppressing his in-court identification and in not granting his motion for a mistrial. We hold that the trial court did not err in denying his motion to suppress, but did err in not granting the mistrial.

The victim testified that on September 27, 1976, she was living alone at her residence in Tucson, Arizona. At about 10:00 p. m. she was preparing to go out for the evening. Shortly before she was to leave she went out to empty the trash near her house. While she was close to the trash can she was grabbed from behind. She saw her assailant's hand and knew that he was

black. The assailant first knocked her down, then moved her over to the side of the house where he and the victim stayed for two or three minutes. In that location there was indirect light from outside porch lights. The victim was frightened and saw the assailant's profile for a total of about a minute. From this she became aware that he was a black man with a small Afro haircut.

The assailant then forced her to go inside the house. He was behind her and she did not see him while they were going in. He first walked her through the house and had her turn out all the lights. She caught a glimpse of him in the bathroom mirror while she was turning off the bathroom light. They ended up in the victim's bedroom. The windows in the bedroom were covered with inexpensive bamboo slats and a very sheer curtain. The bamboo shade over the bed was rolled up three or four inches. The outside porch light was still on and a street light about fifty feet from the northwest corner of the house shone into the window. The intensity of light in the room was similar to candlelight. One could distinguish colors and definitely could see shadows.

The assailant ordered the victim to take off her clothes and removed his own. It took the victim about one and one-half minutes to disrobe. She was then about five feet from the assailant and looked at him, but did not pay attention to his appearance. The assailant then raped her during a period of about 15 minutes. The victim was very upset and tried to ignore him. During intercourse the assailant's face was no further than one and one-half feet from her own. She looked at him at times.

The victim testified:

"Q. After the act was over, what happened?

A. Well, after it was over and I realized, and he got up and he wiped himself off, and I finally realized it was over, he was going to get out of there, I kind of got my calm back. I knew I wasn't going to be hurt at this point, and when he got up, started putting his clothes on, I thought to myself I better take a look at him, to myself. I was laying there on my back when he got up, you know.

Q. About how close was he to you when he was getting dressed and doing these other things?

A. Three feet.

Q. Which direction was he facing?

A. He was facing northwest sometimes, you know, facing the bed."

The victim watched the assailant for about three minutes while he dressed. He was watching her to see that she did not move. After the assailant had finished dressing, he emptied the victim's purse and took her money. It was then that she got her best look at him. She described him as about 5'9", 155 to 160 pounds, strong build with round buttocks. He had a small Afro, ears close to his head, semi-large lips, broad nose and definite shadows below his eyes. He had no facial hair, a medium voice and was in his mid 20's. He wore white pants, a dark maroon or green banlon polo shirt, a leather belt with a heavy buckle, and had a lot of change in his pocket.

On approximately September 29, 1976, the victim attempted to make a composite drawing of the assailant. The kit did not have suitable chin or hairstyle parts to make a satisfactory facial structure. On October 1, 1976, Detective Gomez showed the victim a photo lineup. She selected appellant's photo as the one who appeared to be the person who raped her. At that time, on a scale from 1 to 10, she was about 7½ plus certain that he was the rapist. Gomez told her that he thought appellant was in custody at the time of the rape. The victim, however, still said that she thought it was the appellant and wanted to see an in-person lineup. As it turned out, Gomez was mistaken and appellant was not in custody at the time of the rape.

Two weeks later Det. Gomez again showed the victim the same photo lineup he had shown her on October 1st. Again she stated that she was fairly certain that appellant was the one, but still wanted to see an in-person lineup and listen to a voice lineup.

The next day Gomez arranged an in-person lineup at the Pima County Jail. About one-half hour before it was to take place, Gomez and appellant's trial counsel picked out lineup participants from the jail holding tank. Appellant had been arrested two days before. All the lineup subjects were black and were similarly dressed. After about a minute, the victim recognized one of the subjects but did not specifically point him out because she wanted to be certain and wanted to wait for a voice identification. On recognizing the subject, she left the room and sat down. She was uncertain about prosecuting but told herself that it was her duty and she should go ahead. When she saw Gomez she told him that appellant was the one who raped her. On a scale of 10, her identification at that time was 9 plus plus and ten after she left the room and thought back to the rape. The victim decided at that time she did not need a voice lineup. She was shown a photograph of the physical lineup after she told Gomez that she was positive of her identification. She testified that when she was deciding on her identification after the physical lineup she did not consider the earlier photo lineup.

The victim saw appellant at the preliminary hearing and she testified:

"I walked in the door and then that face just came at me. He was sitting in the courtroom and I just—everything just flashed in front of my face again, and it was the first time I had seen him since the rape, without any means of—you know—screening in front of him. It was like in a real-life situation, again, and the whole thing just flashed in front of my face; and I had to just turn around and walk back out of the room."

The victim identified appellant at the suppression hearing as the person who had raped her. She testified that her identification was based solely on the rape and not on anything that happened afterward.

The physical description which the victim gave to Det. Gomez matched that of appellant except that at the time of his arrest, approximately two weeks after the rape, he had a mustache.

■■ The due process considerations in the area of identification testimony are governed by *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Reliability is the central question, and the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 97 S.Ct. at 381. In examining the reliability of a particular identification, *Neil* requires the trial court to consider (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) length of time between the crime and the confrontation. *Manson* makes it clear that the inquiry stops if no "very substantial likelihood of irreparable misidentification" appears. The Court stated:

"Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 97 S.Ct. at 2254.

The evidence here shows that the *Neil* requirements have been met. Appellant places great weight on the fact that the victim testified that at the time of the rape the assailant had no facial hair, whereas two weeks later he had a mustache. Appellant's roommate testified at trial that on the date of the rape appellant had a mustache. However, this evidence does not destroy the reliability of the victim's in-court identification of appellant. It was up to the jury to decide whether to believe appellant's roommate and whether the scraggly mustache which appellant was wearing at the time of his arrest could have been grown within the two-week period.

Appellant did not take the witness stand. During the course of rebuttal summation the prosecutor made the following statement to the jury:

"Finally, and the final identification for you may be the most important, is her identification here in the courtroom. When she was absolutely certain that the defendant was the person and when you think about that identification in the courtroom and her testimony, think back in your mind—and I'm sure during this period of time when she was testifying, you had occasion to look at the defendant. *How many of you saw him at the time she identified him, that she pointed to him, and where was he looking? He wasn't looking at her, he was looking away. You can remember your observations of him during the course of this trial. Remember the way he looked when she pointed him out and when she told you about the rape, when she told you about the way he kissed her and how revolted she was. Remember your recollections of him, and your observations of him.*"

After the jury retired the defense attorney made a motion for mistrial which was denied.

■ Evidence against a defendant who chooses to refrain from testifying cannot be injected into the case by this method. *Perez v. Territory,* 12 Ariz. 16, 94 P. 1097 (1908). The state cannot use the compelled presence of a defendant at the trial as evidence to convict him when he exercises his right not to testify. *State v. Jordan,* 80 Ariz. 193, 294 P.2d 677 (1956). When a defendant chooses not to testify, the state is not allowed to use the conduct or demeanor of a defendant as evidence in argument against him. *State v. Jordan,* supra. The argument of the prosecutor violated appellant's right not to testify guaranteed him by the Fifth Amendment of the United States Constitution and Art. 2, Sec. 10 of the Constitution of the State of Arizona.

The state argues that appellant waived any objection to the statement when he did not object at the time it was made but instead waited until the jury had retired for deliberation. We do not agree. The error was of constitutional dimension, was highly prejudicial and was not waived by failure to object immediately.

Reversed and remanded for new trial.

RICHMOND, C. J., and HATHAWAY, J., concur.

### ON MOTION FOR REHEARING

HOWARD, Judge.

■ The state contends that we were in error when we held that the remarks made by the prosecutor on rebuttal reached constitutional dimensions. We agree. Our conclusion was the result of a misreading of *State v. Jordan,* 80 Ariz. 193, 294 P.2d 677 (1956). Therefore, appellant's failure to object to the prosecutor's remarks prior to the time the jury retired to deliberate, precludes appellate review.

The motion for rehearing is granted and the judgment is affirmed.

RICHMOND, C. J., and HATHAWAY, J., concur.