The **PEOPLE of the State of Colorado, Petitioner,**

v.

The **DISTRICT COURT FOR the SECOND JUDICIAL DISTRICT, State of Colorado, and the Honorable Alvin D. Lichtenstein, as one of the Judges of the District Court, Respondents.**

No. 79SA286.

*Supreme Court of Colorado, En Banc.*

March 10, 1980.

As Modified on Denial of Rehearing March 31, 1980.

---

2. The state asserts that in *People v. Waits,* 196 Colo. 35, 580 P.2d 391 (1978) this Court did not address the issue of exigent circumstances and did not follow *People v. Neyra, supra,* insofar as it required the presence of exigent circumstances to justify a plain view search. Al-though we recognize that the result reached in *Waits* could be construed as rejecting the requirement of exigent circumstances, we reaffirm the rule set out in *Neyra* and disapprove any language in *Waits* to the contrary.

Dale Tooley, Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for petitioner.

Gerash & Robinson, P. C., Scott H. Robinson, Denver, for respondents.

LEE, Justice.

We issued a rule to show cause why the respondent district court should not be prohibited from suppressing both an out-of-court photographic identification and an in-court identification of the defendant, William L. MacFarland, in a burglary investigation. We now make the rule absolute.

On July 18, 1975, Marian de la Ossa returned to her house at about 10:30 p. m. She had left lights on in the living room and the den, and after coming home she switched on the light in the bathroom. As she walked toward her bedroom, she was confronted by a man who grabbed her arms and pushed her backwards down the hall and into the den, a distance of about twelve feet. During this time, a period of "at the most a minute and a half," the man was facing her at a distance of about a foot and a half. He was not masked.

Mrs. de la Ossa testified at the suppression hearing that, although there was no light on in the hall, it was illuminated by light from adjacent rooms—the bathroom, the living room, and the den. She testified that the light in the hall was good and that she was able to see the intruder clearly.

Once in the den, the intruder told her to lie on the floor, face down, which she did. He tied her up and left the room to search the rest of the house. He took $15 from her purse, all her silver pieces, and her jewelry. He returned to the den with some keys, knelt in front of her, and asked if they were her car keys. Mrs. de la Ossa testified that, when asked that question, she "looked up at him right in the face and he said, 'Don't look at me.'" She testified

that she had looked at him for two or three seconds before putting her head back down on the floor. After a few minutes, he returned again and retied Mrs. de la Ossa and asked how to open the electrically controlled garage door. Upon being told, he then departed in her car.

In recalling her description to the police of the burglar, Mrs. de la Ossa testified that she had told them that "he was probably around 5′ 7″, that his hair was very curly that night because of the heat in the house. He was perspiring badly. I thought that he looked sort of tanned—skin was tanned." She testified further that he was stocky, had brown hair, dark eyes, crooked and stained teeth, and that "his eyes were obvious to me. * * * They were a little further apart or maybe not just in perfect focus."

On the day after the burglary, Detective Dinan of the Denver Police Department brought forty to fifty police "mug shot photos" of Caucasian males to Mrs. de la Ossa's home for possible identification of the intruder. Defendant's photograph was not included in that group of pictures. Mrs. de la Ossa failed to make any identification from the photographs.

The following week, the police received information on a possible suspect (the defendant). On July 26, eight days after the burglary, another police officer, Detective Davis, brought a group of six mug shots, including one of the defendant to Mrs. de la Ossa's home. He testified that he personally selected the photographs, looking for men with hair style, color, and facial features similar to the defendant's, and that he did not restrict his selections to any particular racial background.

Mrs. de la Ossa identified the fourth picture in the group, stating, "This is him definitely." Detective Davis testified that he had said nothing to her prior to her viewing of the photos, other than to ask her to look at them, and she made the identification "without any hesitation whatsoever."

The defendant filed a Motion to Suppress all out-of-court identifications of the defendant and all in-court identifications "tainted by those out-of-court identifications." The district court heard testimony and made extensive findings of fact and conclusions of law, and granted the motion.

The court found, as a matter of law, that Mrs. de la Ossa's photo identification was "tainted by impermissible suggestibility * * * ." The evidence the court cited to support this conclusion included:

(1) "[A]ll the photos were of Chicano males, except that of the defendant, and the previous photo identification was all Caucasian and that no one was chosen." We find no evidence in the record to support the finding that all the photos were of Chicano men. In fact, Detective Davis specifically stated that he did not restrict his selections of photographs to any particular racial background. It is highly questionable that this conclusion can be reached from an examination of the photos alone.

(2) "[T]he photo of the defendant was the only one of two without pronounced and obvious facial hair." We have carefully reviewed the photographs and, while it is accurate to say that four of the six men have facial hair, we do not find that that fact is impermissibly suggestive. None of the four men has a full beard. Their features are not hidden by their facial hair. As the court held in *United States v. Harrison*, 460 F.2d 270 (2nd Cir. 1972), "Most of the photographs used in this identification show faces with a very low degree of prominence in their hirsute adornments which do not obscure their facial contours or features and which would not be likely to distort or mislead in the process of identification." (In that case, the defendant was the only one who was clean-shaven. In this case, two of the six were clean-shaven.)

(3) "[O]ther pictures were of men whose facial features were not similar at all to the picture of the defendant, nor to the description given to the police by Mrs. DeLaOssa [sic] of the appearance of the perpetrator of the burglary." We cannot agree with this conclusion. We find the features of the men in the other photographs to be fairly similar to those of the defendant, and are in

line with the description given to the police of the burglar: stocky build, curly brown hair, dark eyes.

(4) "[T]he defendant's picture was taken at a greater distance than the other photos, and, consequently * * * stood out like—and this is the Court's quote—a sore thumb, end of quote." Again, we have reviewed the photographs and find no significant difference in the size of defendant's photograph so as to make it stick out "like a sore thumb."

(5) "[T]he markings on the front of all the photos, except that of the defendant, showed that those photos were old photos having been taken in either 1970, 1971, 1972 or 1973. The defendant's photo was the only photo that was a new photo having been taken and the date appearing thereon was June, 1975, about a month before the alleged burglary * * *." While it is true that dates are present on each photo, they are not at all prominently displayed. Larger and more prominent are the police identification numbers. Mrs. de la Ossa testified that she did not attach significance to such numbers. The presence of the date on defendant's photo, which we note was prior to the date of the burglary, rather than after, was not so impermissibly suggestive as to taint the witness' identification. Compare Reed v. State, 281 A.2d 142 (Del.1971) (the photograph of the defendant bore the date of the day after the offense, whereas the other photographs used in the identification process bore dates of earlier years—held, not impermissibly suggestive); and Frederick v. Reshetylo, 363 F.Supp. 956 (N.D.Ohio 1973) (the date on the defendant's photograph was the day before the witness viewed it, whereas the dates on the other photographs were at least two years earlier—held, not impermissibly suggestive).

■ In determining the validity of the witness' out-of-court photograph identification against a claim that the identification procedures were impermissibly suggestive, a court must consider the "totality of surrounding circumstances." Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); People v. Jones, 191 Colo. 385, 553 P.2d 770 (1976).

First, there is no argument that it was not necessary for the police to resort to photographic identification in this case. Defendant was unavailable for a lineup or showup. See Simmons v. United States, supra.

It is also not challenged that Mrs. de la Ossa made her identification free of any suggestive comments from the police before or during the photograph lineup. The record is devoid of any evidence whatsoever that the police engaged in any improper conduct directed toward the identification of the defendant. See People v. Jones, supra.

■ The United States Supreme Court has listed factors to be considered in determining the likelihood of misidentification by a witness. These include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ As previously noted, Mrs. de la Ossa had two opportunities to view the intruder face-to-face in areas of her home which were well lighted. She was able to give police a detailed description of the intruder, which closely matched the physical characteristics of the defendant. She was certain of her identification, both at the time she first pointed out his picture to the police and when questioned at the suppression hearing. And, finally, she had identified his photograph within eight days of the burglary, and then once more identified him at the preliminary hearing in 1978. Although her identification at the preliminary hearing was more than three years after the burglary, it followed a valid photographic identification and so is not suspect.

It is only when "the photographic identification procedure was so *impermissibly suggestive* as to give rise to a very substantial likelihood of irreparable misidentification" that is must be suppressed. *Simmons v. United States, supra.* (Emphasis added.) "Short of that point, such evidence is for the jury to weigh." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *See Neighbors v. People,* 171 Colo. 349, 467 P.2d 804 (1970).

Accordingly, the rule is made absolute.