**In the Matter of the Application of Donald McINTOSH for a Writ of Habeas Corpus.**

**No. 79 Civ. 5975 (MEL).**

United States District Court,
S. D. New York.

June 16, 1980.

---

Salaway & Schreiber, Kew Gardens, N. Y., for defendant-petitioner; Gary Schoer, Kew Gardens, N. Y., of counsel.

Carl A. Vergari, Dist. Atty. of Westchester County, White Plains, N. Y., for respondent; Janet Cunard, Asst. Dist. Atty., White Plains, N. Y., of counsel.

LASKER, District Judge.

Donald McIntosh petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on the grounds that he was incarcerated in violation of his due process rights.

At approximately 2:00 A.M. on July 16, 1977, three men armed with two revolvers and a shotgun entered a social club in White Plains, New York, and removed jewelry and personal property from the fifteen to thirty individuals there. About an hour and a half later, after the police had investigated, Doyle Roberts (the owner of the club), Willis Johnson, and several others, all of whom had witnessed the incident, went to police headquarters to view the suspects being held there. They told the police that those men were not the ones who had committed the crime.

Ten days later, Roberts was driving along a street at about 11:00 A.M. and saw standing in front of his building four men he believed to have been responsible for the robbery.[1] He called the police, who arrested the four men.

Roberts notified Johnson[2] that the police had arrested the men Roberts believed to have committed the robbery, and both went to the police station to identify them. There they independently observed each suspect who was handcuffed and seated next to a police officer. McIntosh was identified by Roberts and Johnson as the robber who held a silver or white revolver.

At trial in Westchester County Court, testimony as to this "showup" identification was ruled inadmissible, but Roberts and Johnson were permitted to identify McIntosh in court. The jury found him guilty on several counts of first and second degree robbery and second degree burglary, and he was sentenced to five to fifteen years imprisonment.

## I. The Admission of the Identification Testimony

McIntosh argues that the in court identifications by Roberts and Johnson was tainted by the suggestive showup procedure, and that under the criteria established by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), those identifications were insufficiently reliable so that the failure to suppress that testimony violated his Fourteenth Amendment due process rights.

■ In *Manson v. Brathwaite, supra,* the Court reaffirmed that an identification tainted by improper police procedures may nevertheless be admissible "so long as [it] possesses sufficient aspects of reliability." *Id.,* 432 U.S. at 106, 97 S.Ct. at 2249 (footnote omitted). To determine that reliability, the factors set forth in *Neil v. Biggers,*

*supra,* 409 U.S. at 199–200, 93 S.Ct. at 382 are weighed:

"These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

*Manson, supra,* 432 U.S. at 114, 97 S.Ct. at 2253.

Although not disputing that Johnson's identification was tainted by the showup and is subject to this analysis, the State argues principally that Roberts' identification occurred when he spotted the group of men on the street and that unprovoked confrontation was not tainted by the police showup and not subject to the *Manson* and *Biggers* standard. McIntosh contends that at the time of the encounter on the street, Roberts identified only the "group" who robbed him, and did not identify McIntosh individually, and that Roberts' subsequent identification of him was impermissibly tainted by the suggestive showup procedure.

■ Whether Roberts' identification of the group of men on the street failed to identify McIntosh individually need not be determined because the suggestive showup intervened between that street encounter and Roberts' identification of McIntosh before the jury. Since any identification subsequent to the showup was tainted by that suggestive procedure, the reliability of Roberts', as well as Johnson's, identification of McIntosh must be measured by the *Manson* and *Biggers* test.

■ We find that both Roberts' and Johnson's identifications were sufficiently reliable so that their admission met the

---

1. Three of the men Roberts believed to have been those who entered his club, and the fourth he believed to be the "fingerman" who had been at the club on the day before the incident.

2. Roberts also notified James Johnson, who was at the club at the time of the robbery, but James Johnson was unable to identify McIntosh.

*Manson* and *Biggers* test and did not violate McIntosh's due process rights. Roberts and Johnson had ample opportunity to view McIntosh at the time of the crime. According to Roberts' testimony, the robbery lasted about ten minutes (T35; W9)[3] and to Johnson's, it lasted about five minutes (W73). Both testified that the room was well lighted.[4] Roberts was five to six feet from McIntosh at the time (W8) and was looking from one of the robbers to another throughout the incident (W10). Although for part of the time the man he believed to be McIntosh was standing behind him, Johnson testified that the man was as close as one foot pointing a revolver in his side (T94; W73) and that he was able to observe him (T98; W73).

As to their degree of attention during the crime, both Roberts and Johnson were anything but "a casual or passing observer." *Manson, supra*, at 115, 97 S.Ct. at 2253. As Roberts testified, he was looking from one of the robbers to the other throughout the time they were in the club (W10). Johnson was able to "get a good look at [McIntosh]" (T98; W73).

McIntosh argues that because both Roberts and Johnson were "nervous and scared" at the time of the robbery, their degree of attention was minimal. However, this proposition cuts in both directions. The fact that the victim of a crime is nervous or even terrified does not necessarily show that subsequent identification by that witness is unreliable. Indeed, the intensity of the experience may be argued to engrave the assailants' features in the mind of the victim. Without more than the mere speculation offered on this point, the courts are not equipped to determine whether a person is better or less able to recall subsequently the details of a stressful situation. In order to make an informed decision on this issue a court would need to have available to it either studies of the general cognitive tendencies of persons in frightening situations or evidence in the record of the case at hand independently specifically indicating that the witness was unable to identify the defendant because of fright.

Roberts testified that he was "certain" (T51) and "absolutely" sure (W30) of his identification, and Johnson testified that he had no doubt that his identification was correct (T98–99).

Finally, the ten days between the crime and the confrontation—although longer than the two days found to favor admission of the testimony in *Manson, supra*, 432 U.S. at 116, 97 S.Ct. at 2254, but considerably less than the seven months found to be a negative factor in *Biggers, supra*, 409 U.S. at 201, 93 S.Ct. at 383—is not so long a period as to suggest that the witnesses' recollection was dimmed or undependable.[5]

Furthermore, Roberts' and Johnson's non-identification of the first suspects presented by the police shortly after the robbery indicates their ability to resist suggestive police procedures and supports the reliability of their later identification of McIntosh. *See id.*

We conclude that the identifications of McIntosh by Roberts and Johnson were admissible under *Manson* and *Biggers*.

## II. The Denial of a Motion for a New Trial

McIntosh argues that the denial of a hearing on his post-conviction motion pursuant to N.Y.Crim.Pro.Law § 440.10(1)(g) (McKinney 1971), to set aside the verdict on the grounds of newly discovered evidence violated his due process rights.

 From an examination of the papers submitted on the motion to set aside the verdict and on the motion for a certifi-

---

**3.** References preceded by "T" refer to the trial transcript and those preceded by "W" refer to the *Wade* hearing.

**4.** Roberts testified that the club was more brightly lit than the courtroom (T39–40; W12) and Johnson that it was nearly as bright as the courtroom (T98; W73).

**5.** Since no prior description was given to the police, the third *Manson-Biggers* factor does not contribute to the assessment of the reliability of the identifications here.

cate for appeal of the denial of that motion and the briefs submitted to the Appellate Division, it appears that the issue whether the denial of his motion to set aside the verdict violated McIntosh's federal constitutional rights has not been presented to the New York courts. Since McIntosh's state remedies have not been exhausted on this claim, this court has no jurisdiction to decide its merits.[6] 28 U.S.C. § 2254(b), (c). *See Cameron v. Fastoff*, 543 F.2d 971, 977 (2d Cir. 1976).

Accordingly, the petition for a writ of habeas corpus is denied.

It is so ordered.

---

6. The fact that one claim has not been exhausted does not deprive the court of jurisdiction over the remaining exhausted claims. *Cameron v. Fastoff*, 543 F.2d 971, 976 (2d Cir. 1976); *Mercado v. Rockefeller*, 502 F.2d 666, 668 n.1 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1120, 43 L.Ed.2d 394 (1975); *United States ex rel. Levy v. McMann*, 394 F.2d 402, 404–05 (2d Cir. 1968); *Comment*, 52 N.Y.U.L. Rev. 1428 (1977).