**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Michael Dale CALDWELL,
Defendant–Appellant.**

**No. 16400.**

Missouri Court of Appeals,
Southern District.
Division Two.

March 5, 1990.

1. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

Ellen H. Flottman, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., M. Melissa Manda, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PARRISH, Judge.

Michael Caldwell (hereafter referred to as "defendant") appeals from a judgment of the Circuit Court of Dunklin County convicting him of attempted burglary in the second degree. §§ 569.170 and 564.-011.[1] Defendant was charged as a prior offender. The trial court found him to be a prior offender. § 558.016.2. He was sentenced to imprisonment for a term of four years. This court affirms.

Defendant raises two points by this appeal. He asserts that the trial court erred in failing to suppress an out-of-court identification of him made by the complaining witness. Defendant argues that the identification was made under circumstances which were "inherently unreliable." Defendant also asserts that the trial court erred in permitting a defense witness to answer, over the objection of defendant, a question asking where the witness lived. Defendant claims that the witness resided at a location where he had been placed by an order of a juvenile court. Defendant asserts that § 211.271 prohibited the admission of that testimony.[2]

---

1. All references to statutes are to RSMo 1986 unless otherwise stated.

2. The pertinent part of § 211.271 is as follows:

The facts established by the evidence, viewed in the light most favorable to the verdict, are as follows.

On the morning of December 14, 1988, Deana Lynne Dronberger, age 20, was living at 105 S. Walnut in Kennett, Missouri. The building in which Deana lived was a duplex. Deana lived alone in one of the units. The other unit was occupied by Ruby Westerland, age 92.

Deana had gotten out of bed at approximately 7:30 a.m. After getting out of bed, Deana heard a clicking sound coming from outside her living quarters. The sound came from behind the building. At first, she thought it was her neighbor taking out trash and paid little attention. When the clicking sound continued, Deana investigated. Looking through a window in her kitchen door, Deana saw two figures near a door leading onto her back porch. Deana went closer to the window where she had a better view. She saw two boys attempting to break into the building.

Deana then walked back across her kitchen and proceeded to go to the living quarters occupied by her neighbor, Ruby. Deana went there intending to use Ruby's telephone. Deana had no telephone.

Deana entered a foyer which connects the two living quarters. She knocked on Ruby's door. However, when Ruby did not come to the door promptly, Deana returned to her living quarters and went back to the kitchen. She again looked out the window. She observed the two boys still there "prying and jerking on the door." At that time Deana was about ten feet from the boys. Deana moved the curtain at the window. The boys stopped what they were doing briefly, then resumed jerking on the door attempting to gain entry.

Deana then went back to the foyer to Ruby's door. Ruby was there. She permitted Deana to use her telephone to call the police.

Deana called the police at 7:37 a.m. She reported that two men were trying to break into her house and gave her address. She then returned to her kitchen. By that time the two boys were gone.

Two police officers arrived at Deana's residence at 7:39 a.m. Deana described what had occurred and provided descriptions of the two boys. The police officers examined the back door to Deana's living quarters. They observed scratches on the door facing. The police officers left and began searching the area for two people fitting the descriptions that Deana had given to them.

At approximately 8:20 a.m., Sergeant Tony Smith observed two people who fit the descriptions Deana had provided riding bicycles. They were at a location about eight blocks from Deana's residence. Sergeant Smith took the two of them to the Kennett Police Station. Deana was asked to come there to look at someone. She observed the two people, one of whom was defendant, by looking through a one-way mirror into a room in which defendant and the other suspect were standing. She identified defendant as one of the persons she had seen trying to break into her living quarters. Deana could not identify the other suspect.

Defendant complains that the circumstances surrounding his identification were inherently unreliable. He claims that Deana was in a state of emotional disturbance at the time she identified him, and that this fact should have been given greater weight by the trial court in its assessment of reliability of his identification.

Defendant further complains that, at the police station, Deana was shown only the two suspects. He contends that this produced a substantial likelihood of irreparable misidentification. He claims that the procedure utilized was sufficiently suggestive to make his identification suspect. De-

3. After a child is taken into custody as provided in section 211.131, *all admissions*, confessions, and statements *by the child* to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and *shall not be used for any purpose whatsoever in any proceeding, civil or criminal*, other than proceedings under this chapter. (Emphasis added.)

fendant calls attention to Deana's testimony about what she expected to see at police headquarters. The following question was asked Deana, and the following answer given:

Q. When you went to the police station, did you go expecting to see the person at the police station who you believed you saw at your back door?

A. Yes.

█ Defendant's complaint that Deana was in a state of emotional disturbance is without support. Deana testified that she was surprised to see someone at her porch door at 7:45 in the morning. She stated that she was not afraid, but that she was startled. Approximately one hour later Deana was at the Kennett Police Station identifying defendant. The record before this court shows no evidence of "emotional disturbance."

█ The fact that Deana was shown only the two suspects does not, by itself, render her identification of defendant unreliable. One-on-one viewings are not necessarily improper. *State v. Bynum,* 680 S.W.2d 156, 158 (Mo. banc 1984); *State v. Dodson,* 491 S.W.2d 334, 338 (Mo. banc 1973); *State v. Hamblin,* 448 S.W.2d 603, 611 (Mo.1970); *Simms v. State,* 568 S.W.2d 801, 803 (Mo.App.1978).

█ Likewise, defendant's complaint that Deana expected to see the person at the police station who she thought she had seen at her back door does not demonstrate unreliability. Lineups are not unduly suggestive because the victim anticipates the presence of the offender. *State v. Stephens,* 708 S.W.2d 345, 348 (Mo.App.1986); *State v. Lorenze,* 592 S.W.2d 523, 527 (Mo.App.1979). Identifications are not impermissibly suggestive because a witness knows a lineup includes a suspect who the police believe the witness might identify. *State v. Ealey,* 727 S.W.2d 165, 167 (Mo.App.1987); *State v. Holly,* 697 S.W.2d 250, 252 (Mo.App.1985); *State v. Overstreet,* 694 S.W.2d 491, 495 (Mo.App.1985).

As emphasized by both the state and defendant, the "linchpin" in determining the admissibility of identification testimony is reliability. *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989), *citing Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), and *State v. Story,* 646 S.W.2d 68, 71 (Mo. banc 1983). "Reliability is to be assessed under the totality of the circumstances." *Id.*

The factors to be considered include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.*

█ In this case, Deana had sufficient opportunity to view the persons attempting to break into her living quarters. Her attention was called to their activity by the clicking sound that came from the rear of the building in which she lived. After having heard the clicking sound for ten to fifteen minutes, Deana went to a window in a door at the rear of the building. She pulled back a curtain and looked across a screened back porch to where two individuals were attempting to break into her home. The individuals were about ten feet from where Deana stood. It was approximately 7:30 a.m. The sun was shining. Nothing obstructed her vision. Deana then left that location in her living quarters, went to a foyer and knocked on a neighbor's door. Before the neighbor answered the door, Deana returned to the kitchen, again looked through the same window, and once again saw the same individuals attempting to break into her living quarters. Deana estimated that she watched the two individuals for two minutes. She saw their "whole faces." Those circumstances provided ample opportunity for Deana to view the two persons who attempted to gain entry to her home.

Deana was surprised to see someone at her porch door the morning of the attempted burglary. She testified that she was not

afraid, but that she was startled. Those circumstances, particularly in view of the fact that Deana watched the two people attempt to break into her place of residence, then went to another part of the building, returned, and again watched the two individuals attempt to enter the back porch, demonstrate that Deana gave the events her close attention.

Deana had given the police officers who responded to her call a description of the individuals she had observed. She told the police that there were two boys, about medium height. She described one as wearing a brown jacket and having longer hair than the other. His hair was brown. She described the second as wearing a blue jacket and having shorter brown hair. It was this description that caused the police officer to later arrest defendant and one other person.

After Deana went to the police station to see if she recognized the persons being held there, she looked through a one-way mirror into a small room in which the two persons were standing. It took her "[p]robably a minute at the most" to identify defendant. This identification was made approximately one hour following the time Deana had observed two boys attempting to break into her place of residence.

In assessing whether Deana's out-of-court identification is sufficiently reliable to have been admitted into evidence, a two-pronged test is required. (1) Was the pretrial identification procedure impermissibly suggestive? (2) If so, what impact did the suggestive procedure have upon the witness' reliability? *Hornbuckle*, 769 S.W.2d at 93; *State v. Higgins*, 592 S.W.2d 151, 159 (Mo. banc 1979). If a review, based upon this test, demonstrates that the procedure used in the identification was so suggestive that it gave rise to a very substantial likelihood of irreparable misidentification, identification testimony must be excluded.

In this case, the factors considered in assessing the reliability of Deana's identification demonstrate a high degree of reliability. The pretrial identification procedure was not impermissibly suggestive. There was good reason to have Deana promptly view the two suspects. The prompt viewing of those suspects enabled a quick decision to be made as to whether they were to be charged or released. Had Deana not identified a suspect, a search of the area could have continued without undue delay. In the circumstances of this case, the procedure used was not improper. *See State v. Bynum, supra.*

The trial court committed no error in denying defendant's motion to suppress evidence of the out-of-court identification.

■ Defendant's remaining claim of error is directed to the following questions and answers from the prosecuting attorney's cross-examination of defense witness Tony Lytle:

Q. [The Prosecutor] Tony, where are you staying now?

A. In Alpha.

Q. What's Alpha?

A. Detox center.

Tony Lytle was fifteen years of age. Defendant asserts that Tony was living at Alpha Detoxification Center at the time of trial for the reason that Tony had been placed there by a juvenile court order. Defendant argues, therefore, it was impermissible to inquire as to Tony's place of residence for the reason that § 211.271 prohibits evidence of the results of a juvenile court adjudication. Defendant contends that this questioning of Tony amounted to an effort to impeach his testimony and that the result was that Tony's credibility was improperly undermined.

Defendant is correct in his assertion that § 211.271 prohibits impeachment of a witness by reference to the past juvenile history of that witness. *State v. Williams*, 473 S.W.2d 388, 389 (Mo.1971).[3] At trial defendant's attorney objected when Tony Lytle

**3.** In *Williams*, the court held that § 211.271(3), RSMo 1969, prevented the use of a juvenile court adjudication for purposes of impeaching the credibility of a witness. That statute, in the 1969 revision, contains the same language as is set forth in § 211.271.3 in the 1986 revision quoted in footnote 2.

was asked where he was staying. A conference was held at the bench. Defendant's attorney told the court that he believed Tony Lytle lived at Alpha Center and had been placed there by a juvenile court adjudication, "and under Section 211.271 RSMo that is not proper evidence." The court permitted the question as to the location where Tony Lytle lived to be answered, but advised the attorneys that proof as to why Tony Lytle was at that location would not be permitted.

There is no indication that the question about Tony Lytle's place of residence was asked for purposes of impeaching that witness' credibility. It is routine for an attorney to ask a witness where he or she lives. The asking of that question and its answer were not, in the context of this case, prejudicial to defendant. Further, there is no record before this court which establishes that Tony Lytle was, in fact, placed at Alpha Center as the result of a juvenile court adjudication. Rather, the information provided was the unsubstantiated assertion by defendant's attorney. The trial court did not commit error by permitting the question to be answered.

The judgment is affirmed.

FLANIGAN, P.J., and MAUS, J., concur.