OPINION
On appeal appellant, Jesse D. Bowlson, sets forth the following two assignments of error:
 "First Assignment of Error: The trial court erred in denying Bowlson's motion to suppress the identification evidence obtained through the use of a photo array.
 "Second Assignment of Error: The verdict of the jury was against the manifest weight of the evidence."
The undisputed facts which are relevant to the issues raised on appeal are as follows. On February 29, 1996, at 8:30 a.m., Kimberly S. Mellick was working alone as a convenience store clerk at the Sunset Carryout in Toledo, Ohio. Mellick was counting out money and putting it in envelopes to pay the store's beer suppliers when a man entered the store and forced his way behind the counter. Mellick then activated the store's silent alarm. When she refused to give the man any money, he began punching Mellick in the face. As a result, Mellick's glasses were knocked off and broken, and she sustained a deep cut above her right eyebrow. After several minutes, Mellick told her attacker to take what he wanted and leave. The man then took the envelopes of money which Mellick had placed on the safe, under the counter, and left the store.
In response to the silent alarm, Officer Richard Mendietta and Officer Werner of the Toledo Police Department arrived at the store at approximately 9:00 a.m. Mellick told Mendietta that her attacker was a black male with curly hair, who was five foot nine inches tall, weighed one hundred forty pounds, and was wearing black pants and a black hooded sweatshirt.
Later that same morning, Toledo Police Detective Christopher Delaney spoke to Mellick at the Toledo Hospital, where she was being treated for the cut above her right eyebrow, and asked her to meet with a police sketch artist the next day. On March 1, 1996, Mellick met with Detective Terry Cousino, who produced a composite sketch of the robber, based on Mellick's description. The sketch was subsequently distributed to other members of the Toledo Police Department. Shortly thereafter, Toledo Police Officer Lance Daggett saw the sketch and recognized it as a picture of appellant.
Based on Daggett's identification, Detective Delaney assembled a photo array, consisting of prior booking photographs of appellant and seven other individuals, and presented the array to Mellick on March 4, 1996 at the Sunset Carryout. Although the array initially was composed of eight color photographs, Delaney had black and white versions made for purposes of the array. In less than a minute, Mellick identified appellant's photograph as a picture of the man who punched her in the face and robbed the convenience store on February 29, 1996.
On September 4, 1996, appellant was indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(2). On September 10, 1996, appellant entered a plea of not guilty. On October 23, 1996, appellant filed a motion to suppress the photo array identification. On November 13, 1996, a suppression hearing was held, at which testimony was presented by Detectives Cousino and Delaney.
Cousino testified at the suppression hearing that when he makes a composite sketch, he starts with a general sketch, which he then changes to make the drawing look more like the individual suspect. Cousino further testified that Mellick told him her attacker's hair was "thicker on top and very short on the sides, nearly shaved." He stated that Mellick emphasized that the suspect's eyes were "open very wide"; however, he did not recall any other specific changes that Mellick asked him to make before stating that she was satisfied with the sketch.
Detective Delaney testified at the hearing that he made copies of Cousino's sketch and distributed them to uniformed patrol officers in the Toledo Police Department. Delaney stated that he then assembled photographs of eight black males in their late teens and early twenties. He explained that the photographs originally were in color; however, he had black and white versions made because some of the background colors were "distorted."
Delaney further stated that he showed the photo array to Mellick on March 4, 1996, after telling Mellick he had eight pictures for her to look at, and advising her "if she recognized anyone in the photo array to point those out and tell [him] where she recognized the person from." Delaney testified that when he showed the photos to Mellick she pointed to appellant's picture and said "that was the person that hit her." Delaney stated that, to his knowledge, Mellick had not seen any of the photographs of appellant before viewing the photo array, and she took only "a couple of seconds" to identify appellant from the photograph.
At the close of Delaney's testimony, the trial court denied appellant's motion to suppress. On January 22 and January 23, 1997, a jury trial was held, at which testimony was presented by Mellick, Officer Mendietta, Detectives Cousino and Delaney, and Officer Daggett.
Mellick testified at trial that she was putting approximately $500 in cash for that day's beer orders into envelopes when a man walked into the carry out and proceeded to go behind the counter. She said that when she tried to stop the man, he hit her and her glasses flew off and broke. Mellick stated that the man then began hitting her "over and over" with his fists, after which he picked up the envelopes and walked out the door "like he was a regular customer." She estimated that she saw the man for "about maybe ten seconds" before he began hitting her, and described him as having "huge" eyes, as if he was "high on something." Mellick also said that, although she is nearsighted, she could see the man after her glasses were broken, because he was only an arm's length away from her face. She identified the man who robbed the carry out as appellant.
Mellick further testified that she had worked in various family-owned carry out stores since she was a child and had been trained to observe details about customers. She stated that she described appellant's face, nose, mouth, jewelry, and type of shirt to Cousino, and told Cousino appellant's eyes were "big and glassy." She further stated that appellant's hair and eyes were not the same in court as they were on February 29, 1996. As to the photo array, Mellick stated that it took her "less than a minute" to identify appellant from among the eight black and white pictures, and she did not see the color photo array until after she had identified appellant's picture from the black and white array.
Officer Mendietta testified at trial that when he went to the Sunset Carryout on February 29, 1996, in response to the dispatcher's call, he found Mellick was "pretty beat up." She was also "distraught" and in pain, and her glasses were broken. Mendietta further testified that his back up officer, Officer Werner, interviewed a possible witness on Detroit Avenue, near the carry out; however, Mendietta did not know the witness's name.
Detective Cousino testified at trial that when he met with Mellick to do the composite sketch, he asked her to describe the circumstances of the incident and told her to close her eyes and get a "clear picture" in her mind of the suspect. He stated that Mellick told him the suspect's hair was cut "very, very short, almost shaved" on the sides, and his eyes were very big and round, as if he had an expression of anger or excitement. On cross-examination, Cousino stated that his sketch shows some facial hair on the subject's upper lip; however, Mellick did not mention any facial hair.
Officer Daggett testified at trial that he saw Cousino's sketch within a week after the robbery took place, and he recognized appellant's face and gave appellant's name to Officer Delaney. Daggett stated that he had not seen appellant in person before he identified him as the man in the sketch.
Officer Delaney testified at trial that he distributed copies of Cousino's sketch to Toledo police officers, and that Officers Daggett and Walsh recognized appellant from the sketch. He stated that he then obtained appellant's name and prior booking photo and made up the photo array. Delaney further testified that he made black and white copies of the photo array "[t]o make sure the person that's viewing the photo array is sure of who they are picking." He stated that Mellick picked appellant's photo from the array before she saw the color photos, and that Mellick had no doubt about picking appellant's photo from the array. As to the quality of the photos, Delaney stated that two of the photos still had "marks" in the background, even though they were black and white, although not to the same degree as in the color photos.
Delaney also testified that when he interviewed patrons at Charlie's Bar, located near the Sunset Carryout, on February 29, 1996, one of the patrons gave a description of a person which closely matched Mellick's description of the suspect. However, he stated he did not "put much faith" in the bar patron's description because the man would not give the officer his name, address or telephone number. Delaney further testified that appellant is three inches taller and weighs eighteen pounds more than the person or persons described by Mellick and the bar patron.
At the close of all the evidence, the jury found appellant guilty of aggravated robbery as charged in the indictment. On February 18, 1997, the trial court ordered appellant committed to the Ohio Department of Rehabilitation and Correction for an indefinite term of six to twenty-five years. On March 11, 1997, appellant filed a timely notice of appeal.
Appellant asserts in his first assignment of error that the trial court erred by denying his motion to suppress the results of the photo array identification. In support thereof, appellant argues that the photo array was "suggestive" because two of the black and white photographs, including the photograph of appellant, had backgrounds which were "markedly different" from the others. Appellant further argues that Mellick's identification of appellant was unreliable, because she was not wearing her glasses during the attack, and her description of the suspect did not match appellant's description.
Generally, the admission or exclusion of evidence is left to the discretion of the trial court. State v. Hymore
(1967), 9 Ohio St.2d 122, 128. An in-court identification subsequent to a pretrial photographic identification will be set aside only if the photographic identification procedure was so impermissibly suggestive so as to create "a very substantial likelihood of irreparable misidentification * * *." Simmons v.United States (1968), 390 U.S. 377, 384; State v. Barnett (1990),67 Ohio App.3d 760, 768. Suggestiveness depends upon several factors, including "the size of the array, its manner of presentation, and its contents." Reese v. Fulcomer (C.A. 3, 1991),946 F.2d 247, 260.
However, even a trial court's admission of testimony which is impermissibly suggestive "does not violate due process so long as the identification possesses certain sufficient aspects of reliability." Manson v. Brathwaite (1977), 432 U.S. 98, 106. The United States Supreme Court has established that the following five factors affect the reliability of an identification:
 "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. * * *" Neil v. Biggers (1972), 409 U.S. 188, 199.
In this case, Mellick was presented with a photo array consisting of black and white photographs of eight black males, all within the same age group as appellant. The detective who put together the photo array and was present during the identification testified that he did not tell Mellick that appellant's picture was included in the array, and he had the array produced in black and white to reduce the contrast of the colored backgrounds in the original photos. Mellick testified that she got a good look at the robber before he struck her and broke her glasses and, even after her glasses were broken, she was able to see the robber's face because he was only an arm's length away. In addition, Mellick viewed the photo array within a week of the robbery, and stated at trial that she was able to identify appellant's picture in "less than a minute." Finally, the discrepancies between Mellick's initial description of the robber and appellant's actual description are not so disparate as to render the identification inadmissible.
This court has reviewed the entire record of proceedings before the trial court, including the photo array, and, upon consideration thereof and the law, finds that the totality of the circumstances indicates that the photo array was not impermissibly suggestive and Mellick's identification of appellant therein was not unreliable. Accordingly, the trial court did not abuse its discretion by denying appellant's motion to suppress the photo array identification, and appellant's first assignment of error is not well-taken.
Appellant asserts in his second assignment of error that his conviction was against the manifest weight of the evidence. In support thereof, appellant argues that the only evidence presented at trial connecting appellant to the crime was Mellick's unreliable identification testimony which, when considered along with the police officers' failure to interview additional witnesses, is not substantial enough to support the jury's verdict.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387, citing Tibbs v. Florida (1982), 457 U.S. 31, 42.
To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial.Id.
This court has thoroughly reviewed all of the evidence in this case, including Detective Delaney's testimony concerning his investigation of the crime and, upon consideration thereof, the law, and our disposition as to appellant's first assignment of error, we find no indication that the jury lost its way or created a manifest miscarriage of justice by finding appellant guilty of aggravated robbery. Accordingly, appellant's second assignment of error is not well-taken.
On consideration whereof, this court finds further that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of these proceedings are assessed to appellant.
JUDGMENT AFFIRMED.
 Peter M. Handwork, P.J.
 George M. Glasser, J.
 Melvin L. Resnick, J.
CONCUR.