| .BROWN, J„
Defendant, Quintlan Smith, and his cousin, Trent Smith, were charged with armed robbery. Trent pled guilty to attempted first degree robbery and agreed to testify against his cousin. A jury, by a vote of 11 to 1, found defendant guilty of the responsive verdict of first degree robbery. The trial court imposed a mid-range sentence of 20 years at hard labor without benefit and denied timely filed motions for reconsideration of sentence. On appeal, defendant argues that the evidence is insufficient because there is no credible proof that defendant was the person who committed the armed robbery. Defendant also claims that his sentence is excessive. Finding no error, we affirm defendant’s conviction and sentence.

Discussion

Sufficiency of the Evidence

Defendant argues that the police never showed the victim a photograph of Trent Smith to see if Trent actually was the perpetrator of the crime. Defendant asserts that Trent Smith was identified by a witness as waiting in his car in the parking lot to commit the robbery and that Trent’s *339 self-serving testimony and “sweetheart deal” are not believable. Defendant contends that the victim’s brief opportunity to view the perpetrator and his conflicting descriptions to the investigators made his identification unreliable, particularly, in light of defendant’s alibi witnesses.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
To convict a defendant of armed robbery, the state is required to prove: (1) a taking; (2) of anything of value; (3) from a person or in the immediate control of another; (4) by the use of force or intimidation; (5) while armed with a dangerous weapon (first degree robbery requires only that the offender leads the victim to reasonably believe he is armed with a dangerous weapon). La.R.S. 14:64; La.R.S. 14:64.1; State v. Ford, 26,422 (La.App.2d Cir.09/21/94), 643 So.2d 293. As noted above, the main issue in this assignment of error is the sufficiency of the evidence identifying defendant as the perpetrator.
The U.S. Supreme Court has approved several factors for evaluating the reliability of an identification. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. McCarter, 577 So.2d 816, (La.App. 2d Cir.1991). These factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the victim’s prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Reliability is the linchpin and that is to be determined by the totality of the circumstances. State v. McCarter, supra.
| aThis court’s authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra. Positive identification by only one witness may be sufficient to support a defendant’s conviction. State v. McCarter, supra.

Synopsis of Trial Testimony

Webster Parish Sheriffs Deputy Jared Mclver testified that on June 16, 1997, he responded to an armed robbery call at the Goodwill Road Fina Pob-O-Gold. The victim, Gerald Roth, who worked for LSM Gaming, told Dy. Mclver that he had stopped at the Pot-O-Gold to pick up money from the gaming devices. Roth related that he had several money bags. He came out of the store and put the bags in his truck through the passenger door. When he walked around to the driver’s door, he heard someone running up behind him. Roth turned and saw a black man wearing a dark blue shirt and dark pants. The man had no facial hair and his hair was curly and short. This man stuck a gun to Roth’s head and told him to get into the truck. He told Roth to put all of the money into one bag and give him the truck keys. The victim complied. The robber then told Roth to lie face down *340 in the truck and to not get up or he’d be killed. The robber then ran north on Goodwill Road. This occurred mid-morning on a clear, sunny day.
|4On cross-examination, Deputy Mclver stated that he was dispatched at 9:38 a.m. No weapon was recovered. The description of the robber given by Roth to a follow-up investigator was of a man with hair clipped close on the sides and twisted into small dread locks, not corn rows, on top of his head. Dy. Mclver didn’t ask the victim for a description of the robber’s age, weight or height.
Deputy Jacob Hortman testified that he investigated the robbery, which appeared to have been committed by someone who had inside information about how the gaming business operated. The victim didn’t pick up from Pot^O-Gold every day so someone had to know his schedule. Furthermore, Roth didn’t wear a uniform or drive a marked vehicle. The parking lot attendant went off duty at 8:00 a.m. and the robbery occurred shortly after 9:00 a.m. Dy. Hortman investigated employees of the various businesses at the truck stop, as well as security personnel and employees of LSM Gaming. He learned that Trent Smith, a former employee of LSM, had been discharged for theft. He also discovered that Trent had previously been a courier who picked up money from the Pot-O-Gold. A UPS driver, Gene Kelly, made a delivery at the Poi^O-Gold on the morning of the robbery and had seen a man sitting in a ear with flashing lights parked at 1-20 and Goodwill Road. The PoNO-Gold is located on Goodwill Road just past the 1-20 exit. The car, a beige, 1980s model Chevrolet Caprice, was parked facing the entrance ramp to the interstate. Trent Smith owned such a vehicle. Kelly identified Trent Smith from a photographic lineup as the man he had seen sitting in the Chevrolet.
| ¡¡Further investigation revealed that Trent Smith had financial difficulties. Linwood Auto Mart was in the process of repossessing Trent’s car. However, on June 16th, the day of the robbery, Trent paid $400 to the Auto Mart and on the 17th, he paid an additional $872 to clear up the arrearage.
Deputy Hortman interviewed Trent Smith while he was incarcerated at Caddo Correctional Center. Trent admitted his participation in the robbery. Based upon information provided by Trent, Dy. Hort-man prepared a photo lineup which included a picture of defendant. Roth immediately identified defendant as the robber.
On cross-examination, Dy. Hortman testified that when he first got to the crime scene, the robber was described as a black male, approximately six feet tall with a medium build, wearing a blue shirt, black pants and tennis shoes. Dy. Hortman was told that the robber had run toward the interstate. Defense counsel read from an interview report in which the robber’s hair was described as one to one and one-quarter inches long, randomly twisted into small dread locks, not corn rows. Dy. Hortman could not recall who gave that description.
Video surveillance tapes inside the Pot-O-Gold showed that the UPS man, Gene Kelly, made a delivery around 9:30 a.m. on the date of the robbery, which was “roughly” the time that the robbery occurred.
On redirect examination, Dy. Hortman said that it was common in investigations of serious crimes that descriptions of suspects would vary somewhat. In this case, the victim was much calmer the day after the ^robbery when he gave a more detailed description of the robber’s hair. Dy. Hortman didn’t see any difference between short, curly hair and short dread locks.
*341 Webster Parish Detective Steve Cropper testified that he assisted Dy. Hortman in the investigation. Det. Cropper’s testimony was virtually identical to Dy. Hort-man’s. Det. Cropper also opined that there was not much difference between short curly hair and short dread locks.
The amount taken in the robbery was over $18,000 in cash. None of the stolen money was ever recovered. The photo of defendant which was put in the lineup had been taken shortly before it was used.
The victim, Gerald Roth, testified that on June 16, 1997, he was on his regular collection route for LSM Gaming. He usually arrived at the Pot O Gold between 9:15 and 9:45 a.m. Roth got there on the date of the robbery between 9:15 and 9:30 a.m. He collected the money, left the store and went to his truck. Roth stated that he put the cash in money bags and put them in the truck on the passenger side. When Roth went to the driver’s side he heard someone coming up behind him.
Roth saw a man, about 12 feet away, reach into his waistband and pull out a gun. The man put the gun to Roth’s head. Roth stated that he looked directly at the man’s face. Roth raised his hands, but the man told him to put them down. Roth then turned to look directly at the man, who told him not to look.
The robber put the small money bags into one larger bag. He told Roth to get into the back of the extended cab and lie down. The man then 17left. Roth waited a few seconds before looking up; he then saw the man running toward the interstate.
The robbery occurred in broad daylight. A few days later, Roth described the robber’s hair, which was short and curly, as being short with dread locks. The first photo lineup occurred approximately two weeks after the robbery. Roth picked defendant’s picture from the lineup. Roth also pointed to defendant in court and identified him as the man who held the gun to his head and took the money bag. Roth was “one hundred percent sure” of the identification.
On cross-examination, Roth stated that he looked at three or four lineups over a period of two days. Roth did not pick out any picture other than defendant’s.
Trent Smith testified that he pled guilty to attempted first degree robbery due to his involvement in the crime and that he received a seven year sentence. As part of his plea bargain, Trent agreed to testify truthfully. Trent stated that he had been a pick-up man for LSM Gaming. He was familiar with the routes and knew Roth’s routine. Trent and defendant, his cousin, decided to rob Roth. Trent drove from defendant’s Shreveport home to the Pot-O-Gold and parked on the side of Goodwill Road near the interstate. Trent stayed in the car while defendant got out of the vehicle.
Defendant went to the Pot-O-Gold. Trent stated that he didn’t see what happened in the parking lot. A short time later, defendant ran back to the car with a large money bag. Defendant gave Trent about $5,000.
IsOn cross-examination, Trent reluctantly agreed that he got a good deal from the plea bargain but insisted that he was telling the truth. Trent didn’t remember what defendant had been wearing the day of the robbery. On redirect examination, Trent stated that he couldn’t remember what he had been wearing the day of the robbery and that he didn’t think the plea bargain was very good because he was serving time.
Rhonda Summerlin, a bookkeeper for LSM Gaming, testified that approximately *342 $20,000 was lost in the robbery. The state then rested.
Yakita McBride told the jury that defendant is the father of her children. Ms. McBride noted that defendant was asleep at their Shreveport home on the day of the robbery when she left for work around 6:30 a.m. She had to be at work by 7:00 a.m. Ms. McBride stated that she called defendant at their home at 9:15 a.m. while she was on a break. When he answered the phone, she told him to be sure to feed the baby.
On cross-examination, Ms. McBride said that defendant was unemployed on the date of the robbery. She acknowledged that she had one conviction for felony theft, but nothing else. The prosecutor then pointed out that she had convictions for theft and criminal trespass in 1995, two counts of shoplifting in 1996 and illegal possession of stolen things in 1998. Ms. McBride ended her testimony by agreeing that she didn’t want defendant to go to jail.
Raphael McBride, Ms. McBride’s nephew, testified that he lived with his aunt and defendant on the date of the robbery. On that morning, Raphael stated that he was watching the baby. Yakita left for work 19sometime between 6:00 and 7:00 a.m. Defendant stayed in the house all day.
On cross-examination, Raphael stated that he was “real close” to defendant. Raphael remembered that particular day because he was babysitting. He also agreed, however, that he babysat every day.
Defendant took the stand and testified that at the time of the robbery, he was at home with Raphael and the baby.
On cross-examination, defendant said that he was at home that entire day and that Roth identified the wrong man because he has a grudge against Trent Smith, defendant’s cousin. The defense then rested.
On rebuttal, the state recalled Detective Hortman, who said that he had prepared five photo lineups in this case. Each contained individuals who appeared to be similar in size, complexion and facial structure. The only person Roth picked out was defendant and he did so without hesitation.
The identification procedures are not questioned; rather, the sufficiency of the evidence is the issue. The totality of the evidence, viewed in the light most favorable to the prosecution, shows that defendant, while armed with a pistol and with the use of force and intimidation, took money from the victim. The testimony of the victim is clear and was unshaken. The jury had the opportunity to consider all of defendant’s arguments concerning Trent Smith. The fact that the state was unable to recover the weapon or money does not distract from the testimony of the witnesses. There were no internal contradictions or irreconcilable conflicts. It was the Injury’s responsibility to determine credibility and its verdict was rationally based on competent evidence. This assignment of error is without merit.

Excessive Sentence

Defendant next asserts that his 20-year sentence is excessive.[1]
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or *343 nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.04/02/97), 691 So.2d 864.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, this court will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.04/02/97), 691 So.2d 345.
La.R.S. 14:64.1(B) provides that whoever commits the offense of first degree robbery shall be imprisoned at hard labor for not less than three years and not more than 40 years without benefit.
InOn this record, we find no constitutional error. The sentence imposed is mid-range. Defendant was 23 years old and a second felony offender. He committed a serious, dangerous offense while armed with a deadly weapon. The court considered defendant’s personal history, prior criminal record, the seriousness of the offense and the likelihood of rehabilitation. There is no excuse or justification for the offense, other than greed. Likewise there is no mitigation. This assignment is meritless.

Conclusion

For the reasons set forth above, defendant’s conviction and sentence are AFFIRMED.

. Defendant filed two motions for reconsideration of sentence, both of which were denied. There were two motions because the trial court sentenced defendant twice, once without his counsel present and the second time for the same reasons stated at the prior sentencing.