# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.03-02-00592-CR

**Cleveland Devan Walker, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 52,954, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Cleveland Devan Walker was convicted by a jury of aggravated kidnaping with an affirmative finding of a deadly weapon and sentenced to life imprisonment. *See* Tex. Pen. Code Ann. §§ 20.01(2), .04 (West 2003 & Supp. 2004). He appeals, arguing the evidence is legally and factually insufficient to support the jury's verdict. We affirm the judgment.

## Factual Summary

The complainant, who was sixteen at the time of trial, testified that on December 21, 2001, she stopped at a convenience store on her way home from work sometime after 9:00 p.m. As she left the store, a man walking into the store said hello. As she walked home from the store, she heard a man yell to her, asking if he could walk with her. She consented, and as they walked the man

asked if she would "make love" to him. When she refused, he offered her drugs if she would make love to him. She again refused, and he then put his arms around her waist and pulled her up a hill under a bridge. He threw her down on the ground and put his hands around her throat, squeezing until she stopped screaming. The complainant said that her attacker held a knife to her throat during the attack; the knife was a folding knife, about four or five inches long, and he was able to open it with one hand. He ordered her to take off her pants, saying he would slit her throat if she did not obey. She told him she had to stand up to do so, and as she stood and started to unzip her pants, he glanced away and briefly loosened his grip. The complainant tried to run, and her attacker grabbed her leg, causing them to fall down the hill. He lost his grip on her leg, and she ran, yelling for help. She ran to some apartments, and the occupants of an apartment let her in to call the police.

When the police took the complainant's statement, she told them that her attacker was the man who spoke to her as she left the convenience store. She described him as an older black male, perhaps about five feet, eight inches tall, with a large belly and a gray beard and mustache. She said he was wearing blue sweat pants and a matching jacket, a white t-shirt with a picture on it, dark tennis shoes, and a "toboggan" hat, not a ball cap. At trial, she identified appellant as her attacker and as the man she encountered as she left the store. Appellant had a beard on the night of the attack, but did not have a beard at trial.

On the night of the attack, the police saw a man matching the complainant's description and took him into custody. They brought this suspect to the complainant, who was still at the apartment from which she called the police; the complainant said he was definitely not her attacker. Later that night, the police showed her a photograph of appellant; she was not shown a

2

photographic line-up. When she saw the photo, she became upset and said she had no doubt that it was a photograph of her attacker. The complainant's rejection of the first suspect and initial identification of appellant's photograph occurred on the night of the attack. The complainant never identified anyone but appellant as her attacker. The complainant testified that she saw appellant in several settings, including at the store, during their walk, and during the attack, and she was sure appellant was her attacker.

Several hours later, several police officers went to a boarding house looking for appellant. They knocked on Hilda Lucio's door, and Lucio answered and said appellant was not there. The officers noticed someone hiding in a chair under a blanket, and pulled back the blanket to find appellant. Appellant was wearing a dirty white t-shirt with a picture of a dog on the front and pants described as blue jeans or "dark baggy pants." In the apartment, the police found a blue windbreaker jacket with a white stripe down the sleeves and a pair of white tennis shoes, and appellant said the jacket and shoes were his; the police did not find pants that matched the jacket. There were grass stains and dirt on the shoes. Next to the chair where appellant was sitting, the officers found a folding knife about four inches long; the locking mechanism was broken and the knife could be opened with one hand. One officer said Lucio denied that the knife was hers, and another who arrived later said that Lucio, without looking at the knife, "automatically said, 'It's my knife.'" Appellant denied that the knife was his.

An officer who was familiar with appellant said that appellant is a "smooth talker" who would use euphemisms for bad words. A surveillance videotape from the convenience store shows a heavy-set man wearing a cap with a very short bill, a dark jacket with a white stripe down

3

the sleeve, dark pants, and white tennis shoes.[1] The tape does not show the suspect's face. An officer who videotaped the scene of the attack saw footprints that resembled the tread of appellant's tennis shoes, which were Legacy shoes, an unusual brand. The officer could not say that it was appellant's actual shoes that made the prints, but said the prints were made by "a Legacy with that sort of tread mark." Several defense witnesses testified that they saw appellant sometime between 10:00 p.m. and 2:00 a.m. on the night of December 21. They did not notice that he was out of breath or that his clothing was dirty.

Lucio, who has been diagnosed with schizophrenia and depression, testified that she was living at the boarding house, which is a house for MHMR patients, when the police found appellant in her room. She said appellant often stayed with her, sleeping in her recliner. She first testified that the knife the police found was hers, but when shown the alleged weapon, she said it was not hers and did not look familiar. She said she had one or two knives for cooking and protection, but that they were better than the knife introduced into evidence.

**Standard of Review**

Appellant argues on appeal that the evidence is legally and factually insufficient to support the jury's verdict. In reviewing the evidence for legal sufficiency, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In determining the factual sufficiency of the evidence, we view all of

---

[1] The videotape was not sent to this Court with the record. However, a witness described the contents of the videotape, and the parties do not dispute the accuracy of that testimony.

the evidence in a neutral light and will set aside a verdict only if the proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the verdict. *Id*. at 11. We must be appropriately deferential to the jury's judgment and should not substantially intrude upon the jury's role as the sole judge of the weight and credibility given to witness testimony. *Id.* at 7.

**Analysis**

Appellant argues that the State did not show that appellant "was ever in contact" with the complainant. Appellant supports this statement by pointing out that the complainant was the only identifying witness, that her identification was not corroborated by other witnesses, and that her photo identification was tainted by suggestiveness because she appeared to be in a state of shock and was only shown one photograph. Appellant further argues that there was no evidence that the attacker took the complainant to a location where she was unlikely to be found or that appellant owned or possessed the alleged weapon. Appellant finally argues that the fact that the complainant told the police her attacker was wearing dark shoes shows that the jury's verdict is contrary to the overwhelming weight of the evidence, which shows that appellant owned white shoes. We disagree.

From her first statement to the police, the complainant identified her attacker as the man who spoke to her as she left the convenience store. She gave a clear description of her attacker and his clothing, told the police that the first man shown to her was not her attacker, and immediately identified appellant as her attacker when shown his photograph. Testimony about the videotape from the convenience store described a man wearing a hat and jacket very similar to those reported by the complainant and found in appellant's possession. Appellant was found hiding in a friend's

5

apartment, a knife matching the complainant's description nearby. Lucio said both that the knife did and did not belong to her. Appellant's shoes, an unusual brand, matched the tread marks found at the scene of the attack and had dirt and grass stains on them. The complainant said that her attacker pulled her under a bridge over railroad tracks, and there was testimony that the location was a very deserted area.

A police officer testified that it could have been suggestive to show only one photograph of a suspect to a complainant, who appeared to be in a mild state of shock, instead of showing a photographic line-up. However, the complainant had described her attacker and had already rejected one suspect as being her attacker. The complainant never wavered in her assertion that appellant was her attacker, and her description of her attacker was clear and consistent throughout her dealings with the police. This weighs against an argument that the complainant was swayed into wrongly identifying appellant as her attacker by any suggestiveness associated with her being shown only one photograph. Even if we were to assume that the complainant's initial identification was based on impermissibly suggestive procedures, the totality of the circumstances and evidence indicate that her identification of appellant as her attacker was reliable, and appellant has not carried his heavy burden of showing otherwise. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (in assessing reliability of identification, consider totality of circumstances and weigh possible taint of suggestiveness against factors such as witness's opportunity to view suspect at time of crime, witness's degree of attention, accuracy of witness's earlier descriptions, level of certainty demonstrated by witness at time of identification, and time between crime and identification); *Harris v. State*, 827 S.W.2d 949, 959-60 (Tex. Crim. App. 1992) (defendant had burden of showing

6

unreliability of identification, and assuming pretrial identification was unreliable, totality of circumstances indicated in-court identification was reliable); *Stokes v. State*, No. 03-02-00508-CR, 2003 Tex. App. LEXIS 5096, at *5-10 (Tex. App.—Austin June 19, 2003, no pet.) (not designated for publication) (despite suggestive procedure of police showing witness one suspect, circumstances indicated that identification was reliable). That the complainant told the police her attacker's shoes were black instead of white does not alone cast doubt on the reliability of her identification. Further, the evaluation of the complainant's credibility and the reliability of her identification of appellant were matters to be decided by the jury. *Johnson*, 23 S.W.3d at 7. Whether viewed as a whole or in the light most favorable to the jury's verdict, the evidence was clearly sufficient to support the jury's finding that the complainant's identification was reliable and trustworthy and to support the jury's determination that appellant was guilty of aggravated kidnaping as charged. *Id*. at 7, 11. We overrule appellant's issues on appeal and affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed:  December 11, 2003

Do Not Publish

7